**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | |
|---|---|
| ELAINE SCAIFE, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 1:18-cv-02853-TWP-TAB |
| | ) |
| U.S. DEPARTMENT OF VETERANS AFFAIRS, | ) |
| and ROBERT WILKIE in his official capacity as | ) |
| Secretary of the United States Department of | ) |
| Veterans Affairs, | ) |
| | ) |
| Defendants. | ) |

## ENTRY ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

This matter is before the Court on a Motion for Summary Judgment filed under Federal Rule of Civil Procedure 56 by the United States Department of Veterans Affairs and Robert Wilkie in his official capacity as Secretary of the United States Department of Veterans Affairs (collectively, the "VA") (Filing No. 34). Plaintiff Elaine Scaife ("Ms. Scaife") sued the VA for claims of "Racially/Sexually Hostile Work Environment," "Illegal Retaliation," and "Constructive Discharge" under Title VII of the Civil Rights Act of 1964, as amended (Filing No. 1 at 1, 6, 7–8). In response, the VA moved for summary judgment. For the following reasons, the Court **grants** the VA's Motion for Summary Judgment (Filing No. 34).

## I.    BACKGROUND

The following facts are not necessarily objectively true, but as required by Federal Rule of Civil Procedure 56, the facts are presented in the light most favorable to Plaintiff as the non-moving party. *See Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

Beginning in July 2010, Ms. Scaife, an African American woman, worked at the Roudebush VA Medical Center in Indianapolis, Indiana, ("Roudebush"), as a human resources specialist focusing on job classification, (Filing No. 34-2 at 2; Filing No. 34-1 at 12). She teleworked and was assigned to work in the office three days per week and worked from home two days. (Filing No. 34-1 at 17-18). In her "classifier" role, she was tasked with determining the title, series, grade, and pay for jobs at Roudebush (Filing No. 34-1 at 13). Brian Fogg ("Chief Fogg"), a white male, was the Chief of the Police Service at Roudebush, *id.* at 37. In his position, Chief Fogg was in top management and reported directly to the Assistant Medical Director. (Filing No. 40-2.) In the fall of 2015, Chief Fogg asked Ms. Scaife, who he had no supervisory power over, to approve Captain Roman Holowka ("Captain Holowka") for a Criminal Investigator position at a GS-11 grade, (Filing No. 34-8 at 2; Filing No. 34-1 at 37–39). After reviewing criteria for the position, Ms. Scaife determined that the role legally should be classified at the lower GS-7 grade due to the scope of responsibilities for the position. *Id.* at 39–40. Following email exchanges with Ms. Scaife, Chief Fogg met with Captain Holowka and Brian Blocker ("Officer Blocker") on a different matter on a weekend morning (Filing No. 34-3 at 9–16). Chief Fogg had previously informed Captain Holowka of the GS-11 grade for his new role. At this meeting, Captain Holowka asked whether a decision had been rendered for his new Criminal Investigator position. *Id.* at 18. When he was informed that it had not been approved, Captain Holowka asked why. *Id.* Chief Fogg responded "[b]ecause [Ms. Scaife] is a stupid fucking nigger that's what she does, she likes to fuck with people, I'm fucking pissed about it." (Filing No. 34-5.) Taken aback, Captain Holowka asked Officer Blocker to leave the room and demanded an apology. (Filing No. 34-3 at 19.) Chief Fogg, expressed regret for the remark, attributing it to his agitation with what he perceived to be an impediment to him creating a better department. *Id.* at 19–20, 23; Filing No.

2

34-5.)  He promised Captain Holowka that he would never use the word again.  (Filing No. 34-5.)  Captain Holowka then excused himself from the office and told Officer Blocker that what had transpired "was wrong and is not tolerated."  *Id.*  Because the meeting had taken place over the weekend, no one else heard the dialogue.  (Filing No. 34-3 at 20–21.)  Thinking it was a one-time, stress-induced occurrence, Captain Holowka took no immediate further action since this was the first—and last—time he ever directly heard Chief Fogg use this type language.  *Id.* at 24, 25–26.

Sometime between 2015 and 2016 Gavin Earp ("Mr. Earp"), a white male, became Ms. Scaife's immediate supervisor.  (Filing No. 34-1 at 18–19.)  In August 2016, Ms. Scaife was accosted so loudly by Mr. Earp that a co-worker across the hall overheard "the loud conversation" and emailed Ms. Scaife to see if she "need[ed] help."  ((Filing No. 34-2 at 3;  Filing No. 34-13 at 6;  Filing No. 34–14.)  This same co-worker testified, however, that these types of interactions were not uncommon for Mr. Earp, who "might start an argument" over work-related matters with both men and women alike.  (Filing No. 34-13 at 9–12.)  Ms. Scaife, however, noticed throughout her employment, that her fellow classifier Orlando Sellers ("Mr. Sellers"), an African American man, received better treatment from Mr. Earp.  (Filing No. 34-1 at 22–23, 72.)  For example, though Mr. Earp "was unhappy with [Mr. Sellers'] job performance, [he] never addressed it with him."  (Filing No. 34-2 at 13.)  And while Ms. Scaife "had to send [her] work for review, . . . [Mr. Sellers] did not have to."  *Id.* at 4 (emphasis in original).

Approximately a year later, Mr. Earp told Ms. Scaife that Roudebush's classifications were receiving heightened scrutiny from upper management, and all classifications would now need to be routed through him for final approval.  (Filing No. 34-15 at 1–2.)  Though classifiers had been very independent to that point, Mr. Earp insinuated in a group meeting that they needed to be "more **flexible, and less bureaucratic** with [their] classification determinations."  (Filing No. 34-

2 at 3 (emphasis in original).)   Because Ms. Scaife questioned how she could increase her flexibility in classifying roles considering the narrow federal authorities under which she operated, she felt that Mr. Earp was "implying that [she] should break the law." *Id.*; Filing No. 34-1 at 79–80.  When pushed on this point, Mr. Earp "got loud again," telling the group that if he refused directives to break policy, he would face discipline. *Id.* at 75–76. Ms. Scaife interpreted this as a "subliminal" threat that she too would face discipline if she refused to follow an order she felt broke policy or the law.  *Id.* at 76.  In an "ironic and strange" twist, that very same day, a classifier at a different VA facility sent an email received by Ms. Scaife and Mr. Earp with an article attached titled "No, You Probably Shouldn't Follow Every Order from Your Boss." (Filing No. 34-16 at 1.) Mr. Earp—after responding to the email with a link to an article titled "Federal Court: Agencies Can Punish Employees for Refusing to Break Rules," *id.*—'admitted' in an instant message to Ms. Scaife that he believed she had instigated the sending of the other email, Filing No. 34-1 at 90. After she denied any involvement, Mr. Earp dropped the issue.  *Id.* at 90–91.

Roughly a month later, Mr. Earp asked Ms. Scaife to classify a position "for his friend at another [VA] facility."  *Id.* at 94; Filing No. 34-23 at 1.  After she classified the position lower than he would have liked—and after he had announced that he would be leaving Roudebush the next month for new employment in Colorado (Filing No. 34-28 at 1–2)—Mr. Earp "became enraged, hostile, and began yelling and accused [her] of breaking the law." (Filing No. 34-19 at 1.) Mr. Earp told Ms. Scaife that "what [she] had just done is something that an inexperienced classifier would do." She interpreted his accusations as "demeaning" and "belittling [her] abilities" as a classifier.  (Filing No. 34-1 at 70.)  Mr. Earp then "stormed out" of the office, only to return a few minutes later to yell at Ms. Scaife again.  (Filing No. 34-19 at 1.)  When she encountered a co-worker moments later, Ms. Scaife expressed that Mr. Earp "must have lost his mind[,] going

off on me for doing my job." (Filing No. 34-2 at 8.) Discussing the classification the next day over email, Ms. Scaife told Mr. Earp that she was "shocked and extremely disappointed" in how he had treated her. (Filing No. 34-20 at 1.) When another classifier, who was a white man, confirmed the classification decision, Mr. Earp "threatened" him by saying that he too "was doing something illegal." (Filing No. 34-22 at 7, 15–16, 18.) This classifier confirmed that, over his 32-year career, he had been "told many times, many times to do something that [he felt] wasn't legal" by various people. *Id*. at 6.

The day after the incident, Ms. Scaife discussed the encounter with the Roudebush Equal Employment Opportunity ("EEO") officer. Ms. Scaife commenced EEO activity concerning the hostile environment caused by Mr. Earp's conduct on September 20, 2016. (Filing No. 34-2 at 8.) At the same time, she shared her concerns through numerous text messages to Mr. Earp's direct supervisor, human resources officer Chari Weddle ("Ms. Weddle"), a white woman (Filing No. 34-2 at 14; Filing No. 34-1 at 106). Though she was out of town and in meetings for work, Ms. Weddle eventually responded that, while Mr. Earp had authority to direct Ms. Scaife to act, Ms. Scaife could "choose not to follow his direction" if she felt she was being asked to violate the law. (Filing No. 34-23 at 2.)

After investigating the matter further, Ms. Weddle determined in a formal counseling email that Ms. Scaife had "injected [her] personal opinion" into the classification dispute with Mr. Earp, which, Ms. Weddle resolved, had "clouded [Ms. Scaife's] professional judgment." (Filing No. 34-27 at 1 (emphasis in original).) And by sending Ms. Weddle numerous text messages when she knew she was out of town and busy in meetings, Ms. Scaife had exercised poor judgment. *Id*. In conclusion, Ms. Weddle informed Ms. Scaife that she was "expected to exercise good judgement with respect to identifying urgent matters and also to not interject [her] personal opinion in [her]

professional decisions." *Id.* at 2.  Though this letter did "not constitute a disciplinary action" and was not placed in Ms. Scaife's personnel file, it stated that it could be "used to determine an appropriate penalty should further" action be needed. *Id.*; Filing No. 34-24 at 16, 31.  Nothing about Ms. Scaife's employment—including her pay and hours—changed as a result of this counseling email.  (Filing No. 34-24 at 30–31.)

On or about October 14, 2016, the Director of Roudebush received a notice informing the facility that Scaife had filed EEO charges against it.  (Filing No. 40-2).  Shortly thereafter, Ms. Scaife received the writing counseling email on October 25, 2016.  According to Ms. Weddle, Ms. Scaife's filing of the EEO complaint concerning Mr. Earp's conduct had nothing to do with the counseling email.  *Id.* at 17, 31.  A few days later, Mr. Earp left Roudebush for his new job in Denver.  (Filing No. 34-28 at 1.)

Meanwhile, Captain Holowka learned from others that Chief Fogg had perpetrated racially inappropriate conduct on occasions other than when he called Ms. Scaife the n-word. (Filing No. 34-3 at 31, 33–36), This prompted him to file a complaint with Roudebush's EEO office. (Filing No. 34-10 at 1).  In response, Roudebush conducted assessments and investigated the complaint.  (*See* Filing No. 34-11 at 1.)  Just a few days after she went to Ms. Weddle with her complaint about Mr. Earp, Ms. Scaife heard for the first time about Chief Fogg's racist outburst about her, from a co-worker.[1] (Filing No. 34-1 at 42).  Ms. Scaife also learned from an African-American officer on Roudebush's police force that Chief Fogg had made racially offensive comments to him by

---

[1] The VA objects to this asserted fact, among others advanced by Ms. Scaife, as inadmissible hearsay. (*See* Filing No. 43 at 3–11.)  But because this evidence is not being offered as proof of the matter asserted—rather, it is provided for the effect it had on Ms. Scaife—the Court can consider it when ruling on this summary judgment motion. *See* Fed. R. Evid. 801 (hearsay is a statement offered "to prove the truth of the matter asserted in the statement"); *Cooper-Schut v. Visteon Auto. Sys.*, 361 F.3d 421, 430 (7th Cir. 2004) (finding that the district court correctly allowed an out-of-court hearsay statement into evidence for the limited purpose of the effect that it had on its listener). As far as the VA objects to asserted facts as being not supported by, or misrepresentations of, the evidence, the Court will parse that evidence individually and convey and assess only those facts buttressed by evidentiary proof.

jokingly warning him to not eat or drink all the "watermelon," "fried chicken," or "Kool-Aid" in the cafeteria. *id*. at 45–47.

Devastated by this news, Ms. Scaife met with Captain Holowka on or about September 23, 2016, and he confirmed that Chief Fogg has called her the n-word. She obtained a written summary of the events from Captain Holowka, that he had put together describing Chief Fogg's actions. (Filing No. 34-1; Filing No. 34-5.) In that report, Ms. Scaife learned that Chief Fogg had come to work at Roudebush from the Police Department at the VA hospital in Saginaw, Michigan. (Filing No. 34-3 at 16; Filing No. 40-5 at 12.) There had been an Administrative Investigative Board ("AIB") convened in Saginaw, Michigan to hear allegations of racial and sexual insensitivity within the VA Police Department there, including specific charges of racially insensitive actions by then then Assistant Chief of Police Brian Fogg. (Filing No. 40-5 at 12). One such incident was referring to a black employee as "our token one." (Filing No. 40-11 at 2). As a result of the AIB, Assigned Actions included "[m]ay consider taking Disciplinary Action towards:…Chief Brian Fogg…" for racial insensitivity at the VA facility in Saginaw, Michigan. (Filing No. 40-5 at 7; Filing No. 40-2 at 50-51).

Prior to receiving the written summary from Captain Holowka, Ms. Scaife had already heard of the racial incidents by Chief Fogg at the Saginaw VA facility, possibly from Chief Holowka or from Allen Poythress. (Filing No. 34-1 at 59-60.) She'd also received verification, because someone had sent her a news video from Saginaw. *Id*. She reported the incidents to Ms. Weddle. Despite Chief Fogg facing prior discipline for racial insensitivity at the Saginaw VA facility, (Filing No. 40-5 at 7; Filing No. 40-2 at 10), he faced no further discipline because there was a finding of "no substantiation of racist claims." (Filing No. 40-2 at 11.)

Around the time these events wrapped up, Ms. Scaife, applied for a classifier position—the "[s]ame job"—at a VA facility in California where she could work remotely from her Indianapolis home five days a week, (Filing No. 34-1 at 13–14, 120). After accepting an offer for the job, which did not reduce her pay and fulfilled her preference for telework, Ms. Scaife departed Roudebush a few months later. (Filing No. 34-30.) On her last day, Ms. Scaife expressed, through an email, gratitude to her colleagues for a "good learning experience" but explained that "[i]t has now come time for me [t]o grow, develop, and nurture someplace else!" *Id.* However, Ms. Scaife expressed to Captain Holowka that one reason she felt compelled to leave Roudebush was having to work with Chief Fogg with the knowledge that he had called her the n-word[2]. (Filing No. 34-2 at 58-59.) Approximately a year and a half later, Ms. Scaife sued the VA in this Court under Title VII of the Civil Rights Act of 1964, as amended, alleging a hostile work environment based on both her race and sex, retaliation for exercising her right to file an EEO charge, and constructive discharge. (Filing No. 1.)

## II.   LEGAL STANDARD

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 489–90 (7th Cir. 2007). In ruling on a motion for summary judgment, the court reviews "the record in the light most favorable to the non-moving party and

---

[2] This out-of-court statement is not admitted for the truth of the matters asserted, but rather, to show the statement was made and the impact the statement had on Ms. Scaife.

draw[s] all reasonable inferences in that party's favor." *Zerante*, 555 F.3d at 584 (citation omitted). "However, inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion." *Dorsey v. Morgan Stanley*, 507 F.3d 624, 627 (7th Cir. 2007) (citation and quotation marks omitted). Additionally, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." *Hemsworth*, 476 F.3d at 490 (citation omitted). "The opposing party cannot meet this burden with conclusory statements or speculation but only with appropriate citations to relevant admissible evidence." *Sink v. Knox County Hosp.*, 900 F. Supp. 1065, 1072 (S.D. Ind. 1995) (citations omitted).

"In much the same way that a court is not required to scour the record in search of evidence to defeat a motion for summary judgment, nor is it permitted to conduct a paper trial on the merits of [the] claim." *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001) (citations and quotation marks omitted). "[N]either the mere existence of some alleged factual dispute between the parties nor the existence of some metaphysical doubt as to the material facts is sufficient to defeat a motion for summary judgment." *Chiaramonte v. Fashion Bed Grp., Inc.*, 129 F.3d 391, 395 (7th Cir. 1997) (citations and quotation marks omitted).

## III.   DISCUSSION

The VA moves for summary judgment on several grounds. Initially, the VA argues they are entitled to judgment as a matter of law because Ms. Scaife forfeited all her claims by failing to submit a Statement of Claims as required by the Case Management Order. (Filing No. 35 at 18.) As for the merits, the VA first argues that Ms. Scaife "cannot prevail on either of her hostile work environment claims." *Id*. at 21. Specifically, Ms. Scaife was not subjected to a racially hostile work environment by Chief Fogg's one-time use of the n-word, which she learned about

secondhand. *Id.* at 23. And she was not subjected to a sexually hostile work environment when Mr. Earp's conduct was not based on her sex and did not create a severely or pervasively hostile environment. *Id.* at 26. Next, Ms. Scaife's retaliation claim must fail, the VA argues, because the "formal counseling" email she was sent was not an adverse employment action and there is no causal link between any protected action and the email. *Id.* at 29, 31. Finally, "even if [Ms. Scaife] adequately pled it, [she] was not constructively discharged." *Id.* at 32. The Court will address these contentions in turn.

## A.   <u>Statement of Claims</u>

The VA argues that, since Ms. "Scaife never filed a Statement of Claims," she has "forfeited this suit" by missing the September 27, 2019, deadline. (Filing No. 35 at 18-19, 21.) Noting that this court "has instructed that a party cannot 'flout[] the requirements of a case-management order' by disregarding it," *id.* at 19 (quoting *Harris v. Carrier Corp.*, No. 1:15-cv-01952-JMS-MJD, 2017 WL 4037658, at *2 (S.D. Ind. Sept. 13, 2017)), the VA urges that permitting Ms. Scaife to proceed absent her filing of this statement "prejudices Defendant by leaving it guessing as to which claims Scaife actually intends to advance at the summary judgment stage." *Id.* at 20–21.

In response, Ms. Scaife notes that she "filed her Statement of Claims as part of the joint proposed Case Management Plan". (Filing No. 41 at 16 (citing Filing No. 12).) In fact, Ms. Scaife advises, the VA's arguments to the contrary are "false representations to the court that this defendant should know are not true, and that could be sanctioned pursuant to F.R.C.P. 11." *Id.* Even so, when the issue was brought to her attention by the VA's summary judgment brief, Ms. Scaife notes that she promptly requested, and was later granted, permission to file a Statement of Claims retroactive to September 27, 2019, which was identical to that filed with the proposed Case Management Plan. *Id.*; *see also* Filing No. 36; Filing No. 38; Filing No. 39.

In reply, the VA recognizes that its argument is now moot.  (Filing No. 43 at 19.)  Despite

"not wish[ing] to belabor the point," the VA could not help itself and rejoins that, since a statement

of claims should be filed after the close of evidence, filing it as part of a case management plan

"obviously cannot satisfy this requirement." *Id.* (citing *Harris*, 2017 WL 4037658, at \*2).

Moreover, the VA continues, "[i]t is hardly 'hyper-technical'—let alone 'false,' 'misleading,' or

'sanction[able]'—to expect an opposing party to comply with deadlines set by the Court."  *Id.* at

20 (quoting Filing No. 41 at 16–17). Nonetheless, because Ms. Scaife's Statement of Claims has

been deemed filed as of the deadline contemplated by the Case Management Order, (Filing No.

38), the Court **denies** the VA's Motion for Summary Judgment on this basis, as it recognized, as

moot.

**B.      Hostile work environment**

Title VII's prohibition against discrimination "by employers includes a prohibition against

creating a 'hostile or abusive work environment.'" *Alexander v. Casino Queen, Inc.*, 739 F.3d 972,

982 (7th Cir. 2014) (citing *Adusumilli v. City of Chi.*, 164 F.3d 353, 361 (7th Cir. 1998)).  To

prevail on a hostile work environment claim, a plaintiff must demonstrate four elements: "(1) the

employee was subject to unwelcome harassment; (2) the harassment was based on a reason

forbidden by Title VII [ ]; (3) the harassment was so severe or pervasive that it altered the

conditions of employment and created a hostile or abusive working environment; and (4) there is

a basis for employer liability." *Smith v. Illinois Dep't of Transportation*, 936 F.3d 554, 560 (7th

Cir. 2019) (citing *Huri v. Office of the Chief Judge of the Circuit Court of Cook Cty.*, 804 F.3d

826, 834 (7th Cir. 2015)). In determining whether the conduct is sufficiently severe or pervasive

to be actionable, the court looks at the totality of the circumstances, including: (1) the frequency

of the discriminatory conduct; (2) how offensive a reasonable person would deem it to be; (3)

whether it is physically threatening or humiliating conduct as opposed to verbal abuse; (4) whether it unreasonably interferes with an employee's work performance; and (5) whether it was directed at the victim. *Lambert v. Peri Formworks Sys., Inc.,* 723 F.3d 863, 868 (7th Cir.2013). "Courts should not carve up the incidents of harassment and then separately analyze each incident, by itself, to see if each rises to the level of being severe or pervasive." *Hall v. City of Chicago,* 713 F.3d 325, 331 (7th Cir.2013) (citation and quotation omitted). These various elements and factors aside, the core question for the court is whether "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993).

### 1.      Racially hostile work environment

In her Complaint, Ms. Scaife argues, reciting the elements of the claim, that Chief Fogg's use of the n-word in reference to her

> created a racially hostile work environment in that: (1) Scaife was subjected to unwelcome racially hostile treatment; (2) the discriminatory treatment was because of Scaife's race; (3) the discriminatory treatment was severe or pervasive so as to alter the conditions of Scaife's employment to create a hostile work environment; and (4) the employer is liable because the employer (management) was the source of the discrimination.

(Filing No. 1 at 7.)

Not so, contends the VA in its summary judgment brief. First, despite Chief Fogg's "detestable" use of the epithet, the VA argues that one-time remark outside of Ms. Scaife's presence did not create a hostile work environment. (Filing No. 35 at 23–24 (citing *Nichols v. Michigan City Plant Planning Dep't*, 755 F.3d 594, 601 (7th Cir. 2014)). In *Nichols*, the VA notes, the Seventh Circuit affirmed the grant of summary judgment for an employer after a manager called an employee a "black nigger" while passing him in the hall because "one utterance of the n-word

has not generally been held to be severe enough to rise to the level of establishing liability." *Id.* at 24 (quoting 755 F.3d at 601). Here, the VA argues, the facts are even more inauspicious for Ms. Scaife, as she did not even hear the word and only found out about its use months later. *Id.* at 24–25. Moreover, Ms. Scaife's reliance on "various alleged racial comments that [Chief] Fogg supposedly made about other people," contends the VA, is misplaced: Ms. "Scaife certainly cannot claim that allegations about [Chief] Fogg's conduct towards *other* people caused a hostile work environment to *her* given that she was completely unaware of these allegations until [Captain] Holowka told her about them." *Id.* at 25 (emphases in original) (citing *Russell v. Bd. of Trs. of the Univ. of Ill. at Chi.*, 243 F.3d 336, 343 (7th Cir. 2001)).

In response, Ms. Scaife distinguishes her case from *Nichols*, arguing that the plaintiff there "suffered no interference with his" job and that his workplace was not "as racially charged as" Roudebush because investigations were then scrutinizing, and Ms. Scaife knew about, Chief Fogg's additional racially-suspect conduct (Filing No. 41 at 22–23). Additionally, the leveling of the epithet at Ms. Scaife was weightier than the passing comment in *Nichols* when the statement reflected Chief Fogg's belief that she "performed her job in rating the police department position as she did BECAUSE she was a[n] 'N-word.'" *Id.* at 23 (emphasis in original). All of this, combined with "extremely abusive and hostile actions toward her from her supervisor Gavin Earp" based on her sex, combined to create a racially hostile work environment. *Id.* at 24.

In reply, the VA redoubles that Ms. Scaife's claim cannot prevail when she did not hear Chief Fogg "say this slur," she never heard him "make any racial remarks at all," he "never exercised any supervisory authority" over her, and she "does not claim that anyone other than [Chief] Fogg subjected her to race-based hostile work environment." (Filing No. 43 at 11.) Rebuffing Ms. Scaife's distinguishing her case from *Nichols*, the VA claims that Nichols was

actually treated worse: he "was called 'a black n----r' *to his face*" and "was subjected to other racially derogatory statements (*e.g.*, 'boy')." *Id.* at 12 (emphasis in original) (citing 755 F.3d at 598). And while "'one instance of conduct that is sufficiently severe may be enough' to create a hostile work environment," *id.* (quoting *Jackson v. Cty. of Racine*, 474 F.3d 493, 499 (7th Cir. 2007)), the VA contends that the facts here do not rise to that extreme level when single incidents are measured by their "'severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance,'" *id.* (quoting *Smith v. Sheahan*, 189 F.3d 529, 533–34 (7th Cir. 1999)). Ms. Scaife was never threatened in any way, and, the VA adds, she acknowledged herself that "she always 'worked at or above'" her work expectations. *Id.* at 12–13. Finally, because "[t]his suit is about whether Scaife experienced a hostile work environment on the basis of her race," none of the other evidence of Chief Fogg's racial animosity toward others supports her individual claim. *Id.* at 14 (emphasis in original).

"[T]he word 'nigger' is pure anathema to African–Americans." *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 185 (4th Cir. 2001). As a sister court in this Circuit recognized—thirty-six years ago—this word "automatically separates the person addressed from every non-black person." *Bailey v. Binyon*, 583 F. Supp. 923, 927 (N.D. Ill. 1984). Indeed, the word "was created to divest people of their humanity." *Iconoclasts: Maya Angelou* (Sundance Channel Nov. 30, 2006). Put mildly, "the word 'nigger' can have a highly disturbing impact on the listener." *Hrobowski v. Worthington Steel Co.*, 358 F.3d 473, 477 (7th Cir. 2004). "There is no better proof of its enduring toxicity than the fact that, in polite society, it is spoken and written only in its euphemistic shorthand—'the n-word'—than its full, spelled-out form." Dave Sheinin & Krissah Thompson, *Redefining the Word: Examining a Racial Slur Entrenched in American Vernacular That is More*

*Prevalent than Ever*, WASH. POST (Nov. 9, 2014). As then-Judge Kavanaugh noted—citing everything from Langston Hughes' autobiography *The Big Sea*, to Harper Lee's *To Kill a Mockingbird*, to Alex Haley's *Roots*—"[n]o other word in the English language so powerfully or instantly calls to mind our country's long and brutal struggle to overcome racism and discrimination against African–Americans." *Ayissi-Etoh v. Fannie Mae*, 712 F.3d 572, 580 (D.C. Cir. 2013) (Kavanaugh, J., concurring) (opining that a single use of the word by a supervisor should generate liability). In short, "[t]here is no other word like it in the English language, encompassing [ ] the ugliest sort of hate." Sheinin & Thompson, *supra*.

But, under the binding precedent of this Circuit, a single expression of the awful term does not constitute a hostile work environment under Title VII: "the one-time use of a racial epithet is not severe enough to trigger liability." *Nichols*, 755 F.3d at 601; *Smith v. Ne. Illinois Univ.*, 388 F.3d 559, 567 (7th Cir. 2004) ("One utterance alone does not create an objectively hostile work environment."); *Cf. Hrobowski*, 358 F.3d at 477 (noting that employee established workplace was hostile when "he was *repeatedly* subjected to *hearing* the word 'nigger'") (emphases added). Moreover, a colleague's use of the word carries less weight when "a supervisor's use of the term impacts the work environment far more severely than use by co-equals." *Rodgers v. Western– Southern Life Ins. Co.*, 12 F.3d 668, 675 (7th Cir. 1993). Though he was the leader of his department, Chief Fogg held no supervisory authority over Ms. Scaife. (Filing No. 34-8 at 2.) Likewise, when remarks are "stated directly to the plaintiff," they weigh heavier than when the plaintiff merely "heard them secondhand." *Dandy v. United Parcel Serv., Inc.*, 388 F.3d 263, 271 (7th Cir. 2004). Ms. Scaife never heard Chief Fogg call her the n-word or use any racially problematic language about anyone else. (Filing No. 34-8 at 2.) While "[o]ne instance of conduct

15

that is sufficiently severe may be enough" to create a hostile work environment, *Jackson*, 474 F.3d at 499, the conduct here does not rise to that level.

Ms. Scaife's attempt to sidestep these factual hindrances—by pointing to her apparent knowledge of Chief Fogg's seemingly long-standing history of racial animus toward African Americans—misses the mark. "While certainly relevant to the determination of a hostile work environment claim, when harassment is 'directed at someone other than the plaintiff, the impact of such second-hand harassment is obviously not as great as the impact of harassment directed at the plaintiff.'" *Smith*, 388 F.3d at 567 (7th Cir. 2004) (quoting *McPhaul v. Bd. of Comm'rs of Madison Cty.*, 226 F.3d 558, 567 (7th Cir. 2000), *overruled on other grounds by Hill v. Tangherlini*, 724 F.3d 965 (7th Cir. 2013)) (internal quotations omitted). When, for example, an African-American employee directly heard a co-worker use the n-word in reference to other individuals on a "weekly basis," that "'mere utterance of an . . . epithet which engender[ed] offensive feelings in an employee' [wa]s not sufficient to establish a hostile working environment." *McPhaul*, 226 F.3d at 567 (7th Cir. 2000) (quoting *Harris*, 510 U.S. at 21). Ms. Scaife never heard Chief Fogg state the word, let alone on a weekly basis. Here, as in *Smith v. Ne. Illinois Univ.*, "[t]here is no hostile work environment" when these other instances of unsavory conduct were "not directed at her" and other "staff informed her that they heard" the statements. 388 F.3d at 567. True, a plaintiff can "demonstrate a hostile work environment through second-hand comments or in situations where a plaintiff is not the intended target of the statements." *Id.* But these comments—which were focused at others, were not heard directly by Ms. Scaife, and were only discovered by her own inquiry long after they were stated—did not create a hostile work environment, even when paired with the single epithet said out of her presence that targeted her directly.

On the other hand, in *Cerros II,* the Seventh Circuit concluded that the harassment an employee faced was sufficiently offensive. Cerros provided evidence that he was subjected to direct and highly offensive racial epithets by coworkers and supervisors, where coworkers openly advocated for the Ku Klux Klan and "white power," and racially offensive graffiti was written on the bathroom walls such as "sp-cs," "wetb—ks," "go back to Mexico," and "Tony Cerros is a sp-c." *Cerros v. Steel Technologies, Inc*. 398 F.3d 994, 950 (7th Cir. 2005) (*Cerros II*).

In *Lambert*—a case in which the Seventh Circuit, concluded that the harassment an employee faced was sufficiently offensive to defeat summary judgment—the plaintiff provided evidence that: a top manager, on at least five occasions over a four-year period, referred to yard laborers as "donkeys" in Lambert's presence and on one occasion called an African–American co-worker a "gorilla," and another supervisor told Lambert that he did not respect him because he is a "n——–r" while yelling and screaming at him. 723 F.3d at 865. The court stated that Lambert's case was right on the line of conduct that was offensive. *Id.* at 868.

Though Chief Fogg's use of the odious word was highly offensive and unquestionably uncivil, Title VII is not "a general civility code." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998). Chief Fogg held no supervisory authority over Ms. Scaife. Despite having knowledge of his racist proclivities, Chief Fogg's presence and comments did not pervade the work environment and did not unreasonably interfere with Ms. Scaife's employment at Roudebush. She continued to excel as an employee until the time she separated from the Indianapolis facility. For these reasons, the VA's Motion for Summary Judgment on Ms. Scaife's racially hostile work environment claim must be **granted**.

### 2.   Sexually hostile work environment

Ms. Scaife also argues in her Complaint that she faced a sexually hostile work environment when her "treatment was unwelcome, it was received because of her gender, it was severe and pervasive so as to alter the conditions of her employment, and her employer is liable for the discriminatory treatment because the discrimination came from her immediate supervisor and also from her supervisor's immediate supervisor." (Filing No. 1 at 7.)

In rebuffing this claim in its brief on summary judgment, the VA first argues that Ms. Scaife cannot show that she was treated differently "'based on'" her sex. (Filing No. 35 at 26 quoting *Scruggs v. Garst Seed Co.*, 587 F.3d 832, 841 (7th Cir. 2009).)   Though Ms. Scaife believes that Mr. Earp yelled at or spoke loudly to her because she was a woman, other employees observed him "having 'loud' conversations with a male employee several times." *Id.* (quoting Filing No. 34-13 at 12).   And, the VA argues, these conversations flowed from difficult work dialogues where Mr. Earp and Ms. Scaife disagreed on classification decisions and policy: these disagreements formed the bases for Mr. Earp's elevated tone, not Ms. Scaife's gender. *Id.* (citing *Bermudez v. TRC Holdings, Inc.*, 138 F.3d 1176, 1179 (7th Cir. 1998) ("Holton yelled at her, as he yelled at other workers, but this is not what the Supreme Court means by a 'hostile work environment.'")). In any event, these charged discussions were not, the VA argues, "sufficiently severe or pervasive when Mr. Earp "never physically threatened her" and his "outbursts were isolated incidents." *Id.* at 26–27.   Further, any threats to Ms. Scaife's job for classification decisions could not have been based on her gender when a male coworker was also "'told many times, many times to do something that wasn't legal.'" *Id.* at 27–28 (quoting Filing No. 34-22 at 6). The VA concludes that "[t]he mere fact that Scaife's supervisor asked for the opportunity to

review her work, in response to concerns by his management, does not show of a hostile work environment." *Id.* at 28.

In response, Ms. Scaife argues that when she classified a position differently than Mr. Earp would have liked, he "came unhinged and practically assaulted her in a verbally and physically intimidating manner. (Filing No. 41 at 24.) Mr. Earp also previously told Ms. Scaife and another female African American classifier that they needed to "loosen up" their classifying if they wanted to progress at the VA. *Id.* at 25. Indeed, Mr. Earp "is a classic bully towards women," demonstrated by his history of "getting into their personal space," "yelling at women inappropriately," and "threatening women with insubordination if they disagreed or challenged him." *Id.* at 26–27. To show that she was treated differently because of her gender, Ms. Scaife points out that when Mr. Sellers "made a complete mess" of classifications, Mr. Earp "quietly fixed them . . . without any word or abuse or intimidation." *Id.* at 27. In contrast, when Mr. Earp wanted to "illegally" upgrade a friend's position at a different VA facility, he asked Ms. Scaife to complete it, not a male colleague. *Id.* at 27–28. And, Ms. Scaife argues, because Mr. Earp was Ms. Scaife's "immediate supervisor," the VA clearly faces liability for his conduct, *id.* at 28, when any adverse employment actions she faced were pretextual. *Id.* at 29.

In reply, the VA contends that Ms. Scaife "has only identified three instances in which Earp raised his voice to her." (Filing No. 43 at 14.) Though she claims that more instances occurred, the VA argues that she "must do more than vaguely suggest there were additional incidents beyond the three that she has identified" at summary judgment. *Id.* "In any event," the VA continues, Ms. Scaife's own evidence undermines that contention when she viewed one of the instances "as an extraordinary and unusual occurrence." *Id.* at 15. Further, Ms. Scaife did not receive disparate treatment based on her gender when one woman testified that she was never

degraded by Mr. Earp or treated differently because of her gender and another testified that he treated both men and women alike in passion. *Id.* And despite Ms. Scaife relying on evidence of Mr. Earp's supposed mistreatment of women at a different VA facility, she never worked at that location, and a different woman testified that he never treated women differently there. *Id.* The VA argues that Ms. Scaife's "suggestion that [Mr.] Earp had some nefarious motivation in asking her" to classify his friend's position "is pure fiction": "it was common for sister VA facilities to request outside classification for HR positions." *Id.* at 16. "Finally," the VA concludes, Ms. Scaife cannot show that Mr. Earp's "conduct interfered with her work performance" when she consistently received "Outstanding" and "Excellent" reviews. *Id.* at 17.

Ms. Scaife fails to show both that she was treated differently because of her sex and that any unfavorable treatment was severe or pervasive enough to create a hostile work environment. First, Ms. Scaife argues that Mr. Earp treated her severely because she was a woman. True, Mr. Earp may have raised his voice while speaking to the female Ms. Scaife. But the evidence shows that he did so only when discussing contentious, work-related issues and with employees of both sexes alike. (*See* Filing No. 34-13 at 9–12.) Though we may question this managerial style, Mr. Earp provided an equal opportunity for all to receive his vim and vigor. *See Bermudez*, 138 F.3d at 1179 (holding hostile work environment not created when supervisor yelled at female plaintiff "as he yelled at other workers"). Even if Mr. Earp threatened Ms. Scaife with discipline if she did not classify according to his demands, she has not tied that intimidation to her sex; instead it could be based only on her refusal to accede to his mandate. As for any sex-based preferential treatment of Mr. Sellers—that is, that his work was never reviewed by Mr. Earp—Ms. Scaife fails to relate that the enhanced review policy was instituted *after* Mr. Sellers retired, rendering him an ill-conceived comparator. (Filing No. 34-1 at 25; Filing No. 34-2 at 4, 13.) In any event, that a

supervisor would request review of an subordinate's work is dubious substantiation of sex-based discrimination.

To show the hostility of her work environment, Ms. Scaife argues that her experience was "arguably more severe than that of the plaintiff in *EEOC v. Costco Wholesale Corp.*, 903 F.3d 618 (7th Cir. 2018)." (Filing No. 41 at 28.)  In *Costco*, a member of the warehouse club, among other things,

> followed [a female employee] around the store, watching her from around corners[;] stared at her from behind clothes racks, disguised in sunglasses and a hat[;] monitored her movements and asked her to account for her conversations with men[;] made trips to the warehouse to see [the employee] rather than to shop[; and] 'constantly' asked her out and 'constantly' tried to give her his phone number.

*Id.* at 626.  The Seventh Circuit, when reviewing these facts, "conclude[d] that the district court was right to deny Costco's motion for judgment as a matter of law, because a reasonable jury could conclude that Thompson's conduct was severe or pervasive enough to render [the employee]'s work environment hostile." *Id.* at 621.  But this comparison, the VA urges, "strains credulity." (Filing No. 43 at 16.)

Ms. Scaife's reliance on the case perplexes the Court too; it seemingly has nothing in common with her circumstances other than the root claim of a hostile work environment based on her sex. In *Costco*, a customer subjected the employee to unwelcome romantic and sexual advances. Here, Ms. Scaife was treated, in her view, harshly, in a professional sense, by a supervisor because she was a woman. Yes, "unwelcome treatment need not be based on 'unwelcome sexual advances, requests for sexual favors or other verbal or physical conduct of a sexual nature.'" *Scruggs*, 587 F.3d at 840 (quoting *Boumehdi v. Plastag Holdings, Inc.*, 489 F.3d 781, 788 (7th Cir. 2007).  But to determine whether an environment is "sufficiently severe or pervasive," Courts must consider "the severity of the allegedly discriminatory conduct, its

frequency, whether it is physically threatening or humiliating or merely offensive, and whether it unreasonably interferes with an employee's work performance." *Id.* Ms. Scaife was sporadically treated as inimically as her male counterparts, was never threatened or humiliated, and never slipped in executing her job functions. Moreover, even if Mr. Earp treated employees inhospitably at his prior VA post, (*see* Filing No. 41 at 8 ("Gavin Earp came to the RLR VAMC from the Danville, Illinois VA Medical facility where he was known for mistreating female employees.")), the Court is not clear how his conduct at that facility affected Ms. Scaife's work environment at Roudebush. Simply put, Mr. Earp's "[o]ffhand comments [and] isolated incidents . . . do not rise to the level of conduct that alters the terms and conditions of employment." *Scruggs*, 587 F.3d at 840–41 (citing *Adusumilli v. City of Chicago*, 164 F.3d 353, 361–62 (7th Cir. 1998)). The VA's Motion for Summary Judgment on Ms. Scaife's sexually hostile work environment claim is **granted**.

### 3.      Combined hostile work environment claims

In her Complaint, Ms. Scaife pleads both hostile work environment claims under the same count. (Filing No. 1 at 7.) Chiding this joining of claims in its summary judgment brief, the VA argues that while "some courts have recognized that allegations of hostile work environment may be predicated on a combination of race- and sex-based allegations," this case does not present that opportunity: "the allegations of racially hostile work environment (against Fogg) are separate and distinct from her claims of sex-based hostile work environment (against Earp)." (Filing No. 35 at 22.) In response, Ms. Scaife argues that "because both her racially offensive and gender-based offensive working conditions were occurring basically at the same time," the claims "should not be carved up and analyzed separately but should instead be considered together as one hostile working environment." (Filing No. 41 at 30; *see Mason v. S. Illinois Univ. at Carbondale*, 233

F.3d 1036, 1045 (7th Cir. 2000) ("Courts should not carve up the incidents of harassment and then separately analyze each incident, by itself, to see if each rises to the level of being severe or pervasive.")).

But Ms. Scaife's request to unify these claims to holistically view her work environment strikes against the facts of the case: nowhere does evidence demonstrate any grand unified theory tying together the purportedly race-motivated acts of Chief Fogg with the allegedly sex-driven conduct of Mr. Earp. Even so, because of the marginal instances of race- or sex-based misconduct that would create a known hostile work environment, the Court finds that aggregating the claims still fails to show that "the workplace [wa]s permeated with discriminatory intimidation, ridicule, and insult that [wa]s sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris*, 510 U.S. at 21. The VA's Motion for Summary Judgment on Ms. Scaife's combined hostile work environment claim is **granted**.

## C.   <u>Retaliation</u>

In her Complaint, Ms. Scaife argues that she was retaliated against through "a written disciplinary counseling" after she filed an informal EEO complaint as a result of Mr. "Earp's hostile, belittling, intimidating, and abusive behavior towards her regarding the request for classification" of his friend at a different VA facility. ([Filing No. 1 at 5](#)–6.) Because she received discipline as a direct result of engaging in protected activity, Ms. Scaife asserts that she was the recipient of "illegal retaliation." *Id.* at 8.

In its brief supporting summary judgment, the VA argues that the counseling email "was not an adverse employment action" when it specifically stated it "[d]id not constitute a disciplinary action." ([Filing No. 35 at 29](#) (quoting [Filing No. 34-27 at 2](#)).) Indeed, Ms. "Scaife's work hours,

rate of pay, and other conditions of employment were not changed as a result of this counseling email." *Id*. at 30.  And even if she considered the email a threat for future discipline, any *potential* for the letter to be used in a future conduct evaluation did not render the "email an adverse employment action." *Id*.  Additionally, since Ms. Scaife cannot show that she suffered any adverse employment action, the propriety of the classification is of no consequence. *Id*. at 31.  Finally, Ms. Scaife cannot demonstrate that the "but-for" cause of the counseling email was the filing of the EEO charge when no evidence, other than a month separating the two, shows causation. *Id*. at 31–32.

In response, Ms. Scaife argues that "[t]here was absolutely no legitimate basis for the written counseling from Weddle. It is simply pretextual and represents direct evidence of retaliation because Scaife initiated the EEO process." (Filing No. 41 at 31.)  In support of this broad contention, Ms. Scaife points to the timing of the counseling email following the filing of the EEO complaint and the inclusion of previously unvoiced complaints from years past in the email. *Id*. at 30–31.  In short, it is Ms. "Scaife's belief that she was given a written counseling by HRO Weddle because she filed an EEO complaint." *Id*. at 14.

In reply, the VA resubmits that Ms. "Scaife was not subjected to retaliation when she received the counseling email." (Filing No. 43 at 17.) "In her opposition brief," the VA notes, Ms. "Scaife does not argue that she suffered any tangible job consequences whatsoever". *Id*.  And even if she could, Ms. Scaife cannot show causation when her "EEO complaint played no role in Weddle's decision to send the counseling email," regardless of her "unsupported 'belief.'" *Id*. at 18.

To avoid summary judgment on her retaliation claim, Ms. Scaife "must produce evidence from which a jury could conclude: (1) that she engaged in a statutorily protected activity; (2) that

she suffered a materially adverse action by her employer; and (3) there was a causal link between the two." *Benuzzi v. Bd. of Educ. of City of Chicago*, 647 F.3d 652, 664 (7th Cir. 2011). Ms. Scaife fails to prove the last two prongs.   "'[W]ritten reprimands without any changes in the terms or conditions of . . . employment are not adverse employment actions.'"   *Id.* at 663 (quoting *Lloyd v. Swifty Transp., Inc.*, 552 F.3d 594, 602 (7th Cir. 2009)).   Ms. Scaife points to no "changes in the terms or conditions" of her employment accompanying the counseling email that would constitute "a materially adverse action by her employer." *See id.* at 664; Filing No. 41 at 30–31 (no discussion of additional workplace consequences for filing the EEO complaint).   And on top of this, Ms. Scaife fails to show any causal link between her filing the EEO complaint and her receipt of the counseling email, other than the timing of the two and her "belief" that the former caused the latter. Conviction and timing do not suffice when "temporal proximity between an employee's protected activity and an adverse employment action is rarely sufficient to show that the former caused the latter." *Abrego v. Wilkie*, 907 F.3d 1004, 1015 (7th Cir. 2018).   Because Ms. Scaife cannot show any causal link between filing the EEO complaint and the counseling email, let alone that the email was an adverse employment action, the VA's Motion for Summary Judgment on Ms. Scaife's retaliation claim is **granted**.

**D.     Constructive discharge**

In her Complaint's factual background section, Ms. Scaife notes that after all these preceding events—that is, managerial inaction in response to her hostile working environment and retaliation for filing the EEO charge—she "was constructively discharged when she left her employment at the [Roudebush] by accepting another position within the Agency in Arizona on January 9, 2017." (Filing No. 1 at 6.)   In listing her claims against the VA, however, Ms. Scaife fails to enumerate a constructive discharge claim.

In its brief, the VA first questions whether Ms. Scaife "adequately pled" this claim by not stating it as a separate cause of action. (Filing No. 35 at 32.) Even so, the VA argues, Ms. Scaife "cannot prevail" on the claim when "she was never in any physical danger while working at the Roudebush," and, by the time she left, Mr. "Earp had already left [ ] Roudebush". *Id.* at 33. Moreover, the VA contends, any failure to respond to her workplace complaints does not rise "to the level of egregiousness necessary for a constructive discharge claim." *Id.* at 34. Additionally, her move to a different VA did not constitute discharge when her position remains the same and "[s]he had no reduction in pay or lost wages in taking this position." *Id.* Indeed, the new location "is more convenient because it allows her to telework full time, which she prefers." *Id.* (citing Filing No. 34-1 at 14, 18). This preference, the VA argues, is supported by her farewell email to Roudebush colleagues, informing them that she took the role to "'grow, develop, and nurture' in a new environment." *Id.* (quoting Filing No. 34-30).

In response, Ms. Scaife argues that because she "was subjected to both intolerably abusive conduct on the part of her immediate supervisor [Mr.] Earp and she was subjected to unfounded reprisal from Weddle because she complained and started the EEO process," she reasonably left Roudebush when she feared "for the security of her job." (Filing No. 41 at 31, 32.) "The writing was on the wall," Ms. Scaife urged, that it was time for her to go. *Id.* at 32.

In reply, the VA maintains that Ms. Scaife's argument "makes no sense" since Mr. Earp left Roudebush before she accepted a role at a different VA facility. (Filing No. 43 at 18.) And because the counseling email "did not impact her employment at all," Ms. Scaife faced no "reprisal" for filing the EEO charge that would lead her to feel she needed to resign her post. *Id.* All told, the VA concludes, Ms. Scaife cannot prove she was constructively discharged when she

"did not experience any 'material change in duties or benefits'" by transferring VA locations. *Id.*
at 18–19 (quoting *Griffin v. Potter*, 356 F.3d 824, 830 (7th Cir. 2004)).

To prove constructive discharge as a result of discriminatory harassment, an employee
must show the environment is "'even more egregious than the high standard for hostile work
environment.'" *Fischer v. Avanade, Inc.*, 519 F.3d 393, 409 (7th Cir. 2008) (quoting *EEOC v.
Univ. of Chicago Hosps.*, 276 F.3d 326, 331 (7th Cir. 2002). Looking past any failure to plead the
claim—and that her transfer to the "same job" at a different location with the same pay and her
preferred telework was not an adverse employment action amounting to discharge—since the
Court has already determined that Ms. Scaife faced no hostile work environment based on either
her race or her sex, she cannot meet the higher burden demanded by constructive discharge. *See
Penn. State Police v. Suders*, 542 U.S. 129, 146–47 (2004) (stating that constructive discharge
"entails something more" than a mere hostile work environment claim: the plaintiff "must show
working conditions so intolerable that a reasonable person would have felt compelled to resign").

And to the extent that Ms. Scaife obliquely hints that her constructive discharge was
predicated on an imminent firing (*see* Filing No. 41 at 32 ("The writing was on the wall for Scaife
that she needed to leave that environment."), the VA never "act[ed] in a manner so as to have
communicated to a reasonable employee that she will be terminated." *Univ. of Chicago Hosps.*,
276 F.3d at 332; *see generally Bragg v. Navistar Int'l Transp. Corp.*, 164 F.3d 373, 377 (7th Cir.
1998) ("Constructive discharge exists to give Title VII protection to a plaintiff who decides to quit
rather than wait around to be fired."). Unlike the employee in *Univ. of Chicago Hosps*, at no point
did Ms. Scaife arrive to find her "belongings were packed and her office was being used for
storage." *Univ. of Chicago Hosps.*, 276 F.3d at 332. At no point did she learn of any "intent plan,
and attempt" to fire her. *Id.* At no point did she face significant changes in [her] evaluations." *Id.*

True, she may have received a counseling email.  But nothing in that communication painted her a picture that her time at Roudebush, or with the VA for that matter, was drawing to a close.  In fact, that email was not even entered into Ms. Scaife's personnel file.  In short, at no point was "the handwriting [ ] on the wall and the axe [ ] about to fall."  *Id.*  Because Ms. Scaife has not shown that she was constructively discharged, the VA's Motion for Summary Judgment on this claim is **granted**.

## IV.   CONCLUSION

As an employee of the VA hospital in Indianapolis, the knowledge that the Chief of Police at that facility had spewed a highly offensive racial epithet about her is understandably disheartening, hurtful and distressing.  However, the knowledge that a co-worker is a racist is not enough to constitute a hostile work environment. The question before the Court is did this knowledge constitute harassment that was severe or pervasive, and did this knowledge interfere with the employees' abilities to perform her duties. The answer is that it did not. For the reasons explained above, Ms. Scaife's claims of a "Racially/Sexually Hostile Work Environment," "Illegal Retaliation," and "Constructive Discharge must be dismissed and the VA's Motion for Summary Judgment (Filing No. 34) is **GRANTED**. Final judgment will issue under separate order.

**SO ORDERED.**

Date:  11/30/2020

Hon. Tanya Walton Pratt, Judge
United States District Court
Southern District of Indiana

DISTRIBUTION:

Joseph E. Allman
ALLMAN LAW LLC
jallman@allmanlegal.com

Jackson Taylor Kirklin
UNITED STATES ATTORNEY'S OFFICE (Indianapolis)
taylor.kirklin@usdoj.gov

Lara K. Langeneckert
UNITED STATES ATTORNEY'S OFFICE (Indianapolis)
lara.langeneckert@usdoj.gov